Expressions Hair Design v Schneiderman (2018 NY Slip Op 07037)

Expressions Hair Design v Schneiderman

2018 NY Slip Op 07037 [32 NY3d 382]

October 23, 2018

Fahey, J.

Court of Appeals

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, March 6, 2019

[*1]Argued September 12, 2018; decided October 23, 2018

{**32 NY3d at 384} OPINION OF THE COURT

Fahey, J.

General Business Law § 518 states: "No seller in any sales transaction may impose a surcharge on a holder who elects to use a credit card in lieu of payment by cash, check, or similar means." Few statutes have provoked such diverse interpretations. Our task is to answer a certified question from the United States Court of Appeals for the Second Circuit concerning the meaning of the statute: "Does a merchant comply with New York's General Business Law § 518 so long as the merchant posts the total-dollars-and-cents price charged to credit card users?" (877 F3d 99, 107 [2017].) The parties agree that General Business Law § 518 permits differential pricing, in which a merchant offers discounts to customers who pay by cash, so that customers pay a higher price, for the same item, if they use a credit card, than they would if they paid cash. What the statute prohibits is a more difficult inquiry. For the reasons explained below, we answer the Second Circuit's question in the affirmative.
I.
Credit card companies charge merchants transaction fees or "swipe fees" for customer payments made by credit card. Merchants may pass those fees onto customers, in different ways. A merchant may distribute the cost to all customers, regardless of the means by which they pay, or a merchant may charge those using credit cards more than those who pay by cash, check, or the like. The latter is called "differential pricing."
[*2]
Plaintiffs are five merchants who allege that they wish to engage in differential pricing and to inform customers of their practice by stating the cash price in dollars and cents and the credit card price as a percentage or dollars-and-cents amount, reflecting only the additional charge for credit card purchases and not the total dollars-and-cents price for such purchases. The point is best illustrated by examples. Plaintiffs wish to tell their customers, for example, that "a haircut costs $10.00, and {**32 NY3d at 385}if you pay with a credit card you will pay 3% extra" or "a haircut costs $10.00, and if you pay with a credit card you will pay an additional 30 cents."[FN1] This practice, "listing one price and a separate surcharge amount," has been described as "a single-sticker regime" (Expressions Hair Design v Schneiderman, 581 US —, —, 137 S Ct 1144, 1151 [2017]) or a "single-sticker-price scheme" (Expressions Hair Design v Schneiderman, 877 F3d 99, 101 [2d Cir 2017]), and we refer to it similarly. The merchants have challenged General Business Law § 518 as a violation of their First Amendment rights, to the extent that it allows them to charge credit card users higher prices but prohibits them from describing the price difference as they wish.[FN2] II.
In 2013, plaintiffs Expressions Hair Design, Five Points Academy, Brooklyn Farmacy & Soda Fountain, Brite Buy Wines & Spirits, and Patio.com commenced a lawsuit in federal court against the Attorney General of New York and three District Attorneys, challenging General Business Law § 518. Plaintiffs seek to enjoin the enforcement of the statute on the grounds that it violates the First Amendment and is unconstitutionally vague.
The United States District Court for the Southern District of New York, after noting that "Alice in Wonderland has nothing on section 518 of the New York General Business Law" (Expressions Hair Design v Schneiderman, 975 F Supp 2d 430, 435 [SD NY 2013]), ruled that General Business Law § 518 violates the First Amendment (see id. at 444). The District Court also held that the statute is void for vagueness (see id. at 448). The court duly enjoined the defendants from enforcing the statute.
The United States Court of Appeals for the Second Circuit vacated the District Court's judgment (see Expressions Hair Design v Schneiderman, 808 F3d 118 [2d Cir 2015]), interpreting the statute to prohibit the plaintiffs' desired single-sticker pricing scheme but reasoning that the statute is merely a price regulation that does not implicate First Amendment concerns{**32 NY3d at 386} (see id. at 130-135). The Second Circuit also rejected plaintiffs' vagueness challenge (see id. at 142-144).[FN3]
In 2017, the United States Supreme Court in turn vacated the Second Circuit's judgment (see Expressions Hair Design, 581 US at &mdash, 137 S Ct at 1151). Limiting its review to plaintiffs' proposed single-sticker regime, the Supreme Court accorded deference to, and followed, the Second Circuit's interpretation that "signs of the kind that the merchants wish to post . . . violate § 518 because they identify one sticker price—$10—and indicate that credit card users are charged more than that amount" (581 US at &mdash, 137 S Ct at 1149). However, the Supreme Court held that the prohibition of this practice does implicate the First Amendment (see 581 US at &mdash, 137 S Ct at 1150-1151).
As the Supreme Court understood General Business Law § 518, that law
"regulate[s] . . . how sellers may communicate their prices. A merchant who wants to charge $10 for cash and $10.30 for credit may not convey that price any way he pleases. He is not free to say '$10, with a 3% credit card surcharge' or '$10, plus $0.30 for credit' because both of those displays identify a single sticker price—$10—that is less than the amount credit card users will be charged. Instead, if the merchant wishes to post a single sticker price, he must display $10.30 as his sticker price. . . . In regulating the communication of prices rather than prices themselves, § 518 regulates speech" (581 US at &mdash, 137 S Ct at 1151).
The Supreme Court remanded the case to the Second Circuit for evaluation of General Business Law § 518 as a restraint on speech (see id.), leaving it to the Second Circuit to determine on remand which of two standards should be used to evaluate whether the statute violates the First Amendment: the{**32 NY3d at 387} conventional commercial speech standard of Central Hudson Gas & Elec. Corp. v Public Serv. Comm'n of N. Y., 447 US 557 [1980]) or instead the standard announced in Zauderer v Office of Disciplinary Counsel of Supreme Court of Ohio (471 US 626 [1985]), applicable to commercial disclosure statutes. Finally, the High Court rejected plaintiffs' vagueness challenge (see Expressions Hair Design, 581 US at —, 137 S Ct at 1151-1152).
On remand, the Second Circuit determined that certification was appropriate and asked us "whether a merchant complies with Section 518 so long as the merchant posts the total dollars-and-cents price charged to credit card users" (Expressions Hair Design, 877 F3d at 102; see also id. at 100, 107).
The Second Circuit noted that it would "apply a more lenient standard of review when adjudicating a First Amendment challenge to a law that forces a commercial entity to make purely factual and uncontroversial disclosures regarding the product it is offering for sale" (id. at 103 [internal quotation marks and citations omitted]). "If Section 518 forces a merchant to disclose an item's credit-card price, without otherwise either barring the merchant from (a) implementing (and describing to customers) a pricing scheme that differentiates between payments by credit card and cash or (b) conveying to its customers other information the merchant finds relevant, then Zauderer might apply," but "if the statutory prohibition sweeps much more broadly, then Central Hudson might apply" (id. at 104). Before deciding the question of standard of review, the Second Circuit sought from us "clarification of . . . the actual scope of Section 518's rule" (id.).
We accepted the Second Circuit's certified question pursuant to section 500.27 of our Rules of Practice (22 NYCRR 500.27).
III.
Although plaintiffs have requested that we reformulate the Second Circuit's question, we see no need to rephrase it. We interpret the question to ask whether a merchant, when posting the price of an item, complies with General Business Law § 518 if and only if the merchant posts the total dollars-and-cents price charged to credit card users. Primarily, the Second Circuit seeks to know whether posting the total dollars-and-cents price is a necessary condition of satisfying the statute or whether, instead, a merchant who displays prices using the single-sticker regime would also satisfy the statute.{**32 NY3d at 388}
New York General Business Law § 518 reads:
"No seller in any sales transaction may impose a surcharge on a holder who elects to use a credit card in lieu of payment by cash, check, or similar means.
[*3]"Any seller who violates the provisions of this section shall be guilty of a misdemeanor punishable by a fine not to exceed five hundred dollars or a term of imprisonment up to one year, or both."
Notably, neither plaintiffs nor defendants contend that General Business Law § 518 prohibits differential pricing.[FN4] Indeed, the legislative history of the statute clearly demonstrates that it was not intended to prohibit dual pricing. For example, the State Senate and Assembly Sponsors' Memorandum in support of the legislation makes clear that, under General Business Law § 518, "merchants are permitted to offer cash discounts" (Sponsors' Mem, Bill Jacket, L 1984, ch 160 at 5, 6, 1984 NY Legis Ann at 93; see also Letter from Assembly Sponsor, May 30, 1984, Bill Jacket, L 1984, ch 160 at 8 ["It is important to note that this bill does nothing to prevent a seller from offering a discount to consumers who pay by cash or check"]; Mem of Associate Counsel, NY St Consumer Protection Board, June 1, 1984, Bill Jacket, L 1984, ch 160 at 10 ["Merchants . . . may continue to offer discounts to those customers purchasing in cash"]). Instead, the legislative history demonstrates that the statute governs the manner in which a merchant displays or posts its differential prices.
General Business Law § 518, enacted in 1984 (see L 1984, ch 160), was modeled on certain federal legislation, which had been in effect from 1976 to 1984. The meaning of that legislation is the key to the certified question in this case.
In 1976, the United States Congress passed an amendment to the Truth in Lending Act (TILA) of 1968, providing that "[n]o seller in any sales transaction may impose a surcharge on a cardholder who elects to use a credit card in lieu of payment by cash, check, or similar means" (Act of Feb. 27, 1976, Pub L 94-222, § 3 [c], 90 US Stat 197, codified at 15 USC § 1666f [a] [former (2)]). The 1976 version of TILA thus barred merchants from imposing "surcharges" on customers who use credit cards. {**32 NY3d at 389}The wording (except for the insignificant difference between "cardholder" and "holder") is identical to that later used by New York in General Business Law § 518.
In the 1976 amendment, Congress defined the terms "discount" (as used in the preexisting version of TILA) and "surcharge" (as used in the amendment prohibiting a surcharge) as follows:
"The term 'discount' . . . means a reduction made from the regular price. The term 'discount' . . . shall not mean a surcharge.
". . . The term 'surcharge' . . . means any means of increasing the regular price to a cardholder which is not imposed upon customers paying by cash, check, or similar means." (Id. § 3 [a], codified at 15 USC § 1602 [p], [q], now codified at 15 USC § 1602 [q], [r].)
Significantly, a 1981 renewal of the statute (see Cash Discount Act, Pub L 97-25, § 102 [a], 95 US Stat 144 [97th Cong, 1st Sess, July 27, 1981]) supplemented the provisions—which had defined "discount" and "surcharge" in terms of the retailer's "regular price"—by defining the term "regular price." The 1981 renewal added a provision explaining the concept as follows:
"[T]he term 'regular price' means the tag or posted price charged for the property or service if a single price is tagged or posted, or the price charged for the property or service when payment is made by use of . . . a credit card if either (1) no price is tagged or posted, or (2) two prices are tagged or posted, one of which is charged when payment is made by use of . . . a credit card and the other when payment is made by use of cash, check, or similar means." (Cash Discount Act § 102 [a], Pub L 97-25, § 102 [a], 95 US Stat 144, codified at 15 USC § 1602 [z], now codified at 15 USC § 1602 [y].)
[*4]If a merchant "tagged or posted" a single price, the "regular price" was that single price. If no price was tagged or posted, or if a merchant employed a two-sticker approach—posting one total price for credit and another for cash—the regular price was defined as the price charged to credit card users. Under the 1981 amendment, then, because the prohibited "surcharge" had been defined as an increase from the regular price, and{**32 NY3d at 390} the "regular price" was now defined to include the amount charged to credit card customers when that higher amount was posted, there would be no prohibited credit card "surcharge" if the total credit card price was posted.
The definition of "regular price" was intended to clarify that the no-surcharge provision "permits merchants to have two-tier pricing systems and to offer a differential between the credit price and the cash price" as long as merchants ensure that "when prices are tagged or posted, the consumers will be exposed to the highest price when they see a tagged or posted price" (S Rep 97-23, 97th Cong, 1st Sess at 4 [emphasis added], reprinted in 1981 US Code Cong & Admin News at 77). The effect of the 1981 amendment was to explain the statute's significance: a merchant who displayed two-sticker pricing, in which the total credit card price in dollars-and-cents form was listed alongside the cash price, would comply with the federal statute, as would a merchant who displayed only the higher, credit card price. On the other hand, as the United States explained in the amicus brief submitted to the Supreme Court in this case, the statute would be violated "when the merchant displayed the lower cash price in dollars and cents without doing the same for the higher credit-card price" (brief for United States as amicus curiae supporting neither party at 8 [Nov. 21, 2016] in Expressions Hair Design v Schneiderman, 581 US —, 137 S Ct 1144 [2017], available at 2016 WL 6892600). As the Supreme Court interpreted the federal law, a merchant would "violate the surcharge ban only by posting a single price and charging credit card users more than that posted price" (Expressions Hair Design, 581 US at —, 137 S Ct at 1147).
The federal statute, effective for three years following its renewal in 1981, lapsed in February 1984. In New York, a state law was quickly proposed to replace the federal ban. General Business Law § 518, which became effective on June 5, 1984, copied the operative text of the lapsed federal provision prohibiting surcharges, except that the New York statute did not include definitions of "discount," "surcharge," or "regular price." The New York statute has been enforced only in a sporadic manner. The first prosecution appears to have occurred in 1986, followed by a long hiatus and then further enforcement about a decade ago.
IV.
The purpose of the federal statute is clear. It was intended to ensure{**32 NY3d at 391}
"that consumers will be seeing at least the highest possible price they will have to pay when they see a tagged or posted price. In other words, consumers cannot be lured . . . on the basis of the 'low, rock-bottom price' only to find at the cash register that the price will be higher if a credit card is used" (S Rep 97-23 at 4, reprinted in 1981 US Code Cong & Admin News at 77).
"Each individual merchant should be free to determine what manner or method of disclosure best suits his or her purpose, so long as a good faith effort has been made to clearly and conspicuously disclose the availability of cash discounts" (S Rep 97-23 at 3, reprinted in 1981 US Code Cong & Admin News at 76). In other words, the concern of Congress was the prohibition of deceptive marketing. As Senator John Chafee described in debate, a customer, when confronted with a higher price at the last moment, may decline to pay but, on the other hand, "we are all susceptible to being bullied" and "[t]he customer is not going to go through the embarrassment" of deciding not to purchase an item because of a sudden late surcharge (127 Cong Rec S4220 [Mar. 12, 1981]).
It is also clear that the intent of New York's legislature, in enacting General Business Law § 518, was to replicate the prohibitions in the federal statute and create a ban coextensive with its recently defunct federal counterpart. The State Senate and Assembly sponsors of the bill wrote in their Memorandum in Support that the proposed statute would operate "in keeping with the provisions of the Federal ban that recently expired" (Sponsors' Mem, Bill Jacket, L 1984, ch 160 at 5, 6, 1984 NY Legis Ann at 93). Therefore, the sponsors explained, "[t]he only procedure that would be prohibited is a surcharge for credit" (id.). The Assembly sponsor wrote in a letter to the Governor's Counsel that the state bill would contain an understanding of "surcharge" that was "identical to the definition" in the lapsed federal statute (Letter from Assembly Sponsor, May 30, 1984, Bill Jacket, L 1984, ch 160 at 8). The Senate sponsor wrote in a similar letter that the bill would provide New York consumers with the same "essential protection in the market place" as the lapsed federal legislation (Letter from Senate Sponsor, May 29, 1984, Bill Jacket, L 1984, ch 160 at 7).
Moreover, General Business Law § 518's legislative history demonstrates the identical concerns Congress had: a desire to allow differential pricing, but to avoid the duping of customers by posting or tagging low prices that turn out to be [*5]available{**32 NY3d at 392} for cash purchases only. The Sponsors' Memorandum indicates that the bill was intended to prevent "dubious marketing practices and variable purchase prices" (Sponsors' Mem, Bill Jacket, L 1984, ch 160 at 5, 6, 1984 NY Legis Ann at 93). The State Consumer Protection Board's Associate Counsel echoed this view by noting that the problem the statute aimed to confront was that consumers should not face "unannounced price increases at the point of sale" and should be able to "depend on advertised . . . prices" (Mem of Associate Counsel, NY St Consumer Protection Board, Bill Jacket, L 1984, ch 160 at 10).
In light of this legislative history, we conclude that General Business Law § 518, like its federal precursor, permits differential pricing but requires that a higher price charged to credit card users be posted in total dollars-and-cents form. In that way, credit card customers are "exposed to the highest price when they see a tagged or posted price" (S Rep 97-23 at 4, reprinted in 1981 US Code Cong & Admin News at 77) and, without further ado, apprehend the actual price they will pay. By contrast, single-sticker pricing would require a consumer to engage in arithmetic, which may be difficult depending on the cash price, in order to calculate the actual price for a credit card purchase.
It is true that the legislature, when copying the language of General Business Law § 518 from TILA, failed to include the definitions that Congress had added in 1981, defining "surcharge" and "discount" (see Cash Discount Act § 102 [a], Pub L 97-25, § 102 [a], 95 US Stat 144 [1981]; 15 USC § 1602 [y]). Yet, here, the failure to adopt the definitions cannot reasonably be interpreted as evincing a legislative desire to chart a different course than the approach taken by Congress. The legislature would not have tracked the federal statute almost verbatim had it intended to adopt a different type of surcharge law. It is also clear from the legislative history that the legislature did not intend to deviate from the purpose—expressed in both the federal and New York legislative histories—to permit differential pricing but avoid deceptions arising from situations in which only a lower cash price, unavailable to credit card purchasers, was posted or tagged. By 1984, the scope of the protection afforded by the federal statute was well understood and the legislature made plain its intent to extend that same protection to New York consumers. Under these circumstances, the omission of the federal definitions does not justify a reading of the statute that would defeat the legislature's plain intent to extend the federal law for New{**32 NY3d at 393} Yorkers. Nor are we prepared to infer the statutory meaning from the sparse and discontinuous record of enforcement of section 518.
V.
Finally, so long as the total dollars-and-cents price charged for credit card purchases is posted, nothing in General Business Law § 518 prohibits merchants from explaining the difference in price as a "surcharge" attributable to credit card transaction fees they must bear.[FN5] Of course, once price is communicated in the manner required by General Business Law § 518, the merchant does not "impose a surcharge" within the meaning of the statute. However, imposing a surcharge (as defined by the statute) and using the word "surcharge" are two different things. There is nothing in the legislative history of General Business Law § 518 or of the federal statute on which it was based to suggest that a merchant could not use the word "surcharge"—or words such as "additional fee" or "extra cost"—to communicate to customers that the credit card price is higher than the cash price. By disclosing the total dollars-and-cents price charged to credit card users, a merchant complies with the statute. The process by which the merchant characterizes the higher amount is irrelevant to the statutory requirement. In short, merchants are free to call the price differential anything they wish without fear of prosecution under the statute.
VI.
For the above reasons, we conclude that a merchant complies with General Business Law § 518 if and only if the merchant posts the total dollars-and-cents price charged to credit card users. In that circumstance, consumers see the highest possible price they must pay for credit card use and the legislative concerns about luring or misleading customers by use of a low price available only for cash purchases are alleviated. To be clear, plaintiffs' proposed single-sticker [*6]pricing scheme—which does not express the total dollars-and-cents credit card price and instead requires consumers to engage in an arithmetical{**32 NY3d at 394} calculation, in order to figure it out—is prohibited by the statute.
Accordingly, the certified question should be answered in the affirmative.

Rivera, J. (concurring in result). The United States Court of Appeals for the Second Circuit has certified the question, "Does a merchant comply with New York's General Business Law § 518 so long as the merchant posts the total-dollars-and-cents price charged to credit card users?" (877 F3d 99, 107 [2017].) I read that question to mean only whether a merchant who chooses to communicate the price to customers in this manner—without any other indication as to how the merchant decided on the credit card price—thereby avoids criminal prosecution. With that understanding, I agree with the majority that the certified question should be answered in the affirmative.
Unlike my colleagues in the majority and Judge Garcia in dissent, I reach that conclusion without resolving whether the legislature intended section 518 to enable consumers to "apprehend the actual price they will pay," which effectively interprets the provision to be a disclosure statute (majority op at 
391-392 Garcia, J., dissenting op at 413-414), or need to consider the legislative history of section 518 or its federal predecessor (majority op at 
390-393 Garcia, J., dissenting op at 408-410). However, Judge Garcia is correct that we discern the statutory purpose, and determine the answer to the certified question, by application of our rules of statutory construction; those rules do not permit us to import the now-expired federal law definitions for "surcharge," "discount" and "regular price" (Garcia, J., dissenting op at 
416-417).[FN*]
Where a statutory term is undefined, "we have regarded dictionary definitions as useful guideposts" in "determining the {**32 NY3d at 395}meaning of statutory language" (People v Andujar, 30 NY3d 160, 163 [2017] [internal quotation marks omitted], quoting People v Ocasio, 28 NY3d 178, 181 [2016]; accord Yaniveth R. v LTD Realty Co., 27 NY3d 186, 192 [2016]; De La Cruz v Caddell Dry Dock & Repair Co., Inc., 21 NY3d 530, 538 [2013]). From at least the time of the statute's enactment, up to today, "surcharge" has been commonly defined as "an additional tax, cost, or impost" upon a standard amount (Webster's New Collegiate Dictionary 1163 [1981]; see also Black's Law Dictionary [10th ed 2014], surcharge [defining surcharge as an "additional tax, charge, or cost"]; Webster's Third New International Dictionary 2299 [2002] [defining "surcharge" as "a charge in excess of the usual or normal amount"]; Webster's Second New International Dictionary [1955] [same]). For the reasons discussed by the majority, the legislative history supports that this was the legislature's intended definition.
Within the context of section 518, a surcharge can only be determined by reference to the normal price set by the merchant. As I read the statute, the only way a merchant may avoid criminal liability is to adopt the higher credit card price as the normal price. In other words, a merchant who adopts a single pricing scheme—charging all customers the same price regardless of method of payment—has necessarily adopted the credit card price as the normal price, as does a merchant who adopts a differential pricing scheme—charging a higher price to those paying with a credit card—because that merchant cannot impose a surcharge on the normal price on credit card-paying customers but can only offer a discount from the normal price to customers who pay cash.
This was ultimately the approach adopted by Congress and reflected in the definitions added to the federal statute (see Cash Discount Act § 102 [a], Pub L 97-25, 95 US Stat 144 [1981]). Perhaps our state legislature believed it unnecessary to expressly adopt the federal language because the commonly understood definition of "surcharge" and the result-oriented federal definitions both lead to the normalization of the higher credit card price. Regardless of the intent, the definition holds and applying that definition to answer the certified question, I conclude that a merchant who posts the total dollars-and-cents price for a credit card purchase has adopted that price as the{**32 NY3d at 396} normal price, and therefore complies with section 518. I see no way to avoid this reading of the statute, even if normalization of the credit card price is contrary to the message a merchant wants to communicate to customers.
For this reason, I disagree with the majority's conclusion that a merchant may describe the difference between the credit card price and the cash price as a "surcharge," "additional fee," or "extra cost" (majority op at 
393). To do so would permit a merchant to characterize the credit card price—and as a consequence demand payment—in the only way expressly prohibited by the legislature.

Wilson, J. (concurring in part and dissenting in part). The certified question asks whether a merchant is safe from criminal prosecution under General Business Law § 518 "so long as the merchant posts the total-dollars-and-cents price charged to credit card users?" (877 F3d 99, 107 [2017].) I would answer that question in the affirmative. As I see it, all conduct complies with the law, because the law is unconstitutionally vague, and therefore cannot reasonably be said to prohibit anything. I part ways with the majority when it attempts to describe what General Business Law § 518 does prohibit, which we have not been asked, and, truthfully, to which we can provide no reasonable answer.
I.
The initial objection to my claim of vagueness may be that the United States Supreme Court has already rejected the merchants' vagueness challenge (Expressions Hair Design v Schneiderman, 581 US &mdash, &mdash, 137 S Ct 1144, 1152 [2017]). To the contrary, the Supreme Court noted that it " 'accord[ed] great deference to the interpretation and application of state law by the [federal] courts of appeals' . . . because lower federal courts 'are better schooled in and more able to interpret the laws of their respective States' " (Expressions Hair Design, 581 US at —, 137 S Ct at 1149-1150, citing Brockett v Spokane Arcades, Inc., 472 US 491, 500 [1985]). Noting that its jurisprudence allowed it to disregard the Second Circuit's construction only if that construction was "clearly wrong" or "plain error," the Supreme Court accepted the Second Circuit's construction—for the purpose of that appeal—because it "cannot dismiss the [Second Circuit's] interpretation of § 518 as 'clearly wrong' " (Expressions Hair Design, 581 US at —, 137 S Ct at 1150).
{**32 NY3d at 397}However, the definitive construction of General Business Law § 518 is our responsibility (see e.g. Johnson v Fankell, 520 US 911, 916 [1997]). That is why the Supreme Court suggested, and the Second Circuit requested, that we construe it. Thus, the Supreme Court's statement that the merchants' "vagueness challenge gives us little pause" (581 US at —, 137 S Ct at 1151) is a hypothetical statement based on the Supreme Court's temporary acceptance of the Second Circuit's interpretation of the meaning of General Business Law § 518. Whether General Business Law § 518 can reasonably be construed to specify what it proscribes is open to us, as, therefore, is the vagueness challenge. The certified question asks only whether a particular practice is lawful, which it is. If we stopped there, the vagueness question would not be raised here. But because the majority goes beyond that question and attempts to answer what General Business Law § 518 does criminalize, the vagueness question is necessarily raised front and center.
II.
Read plainly, section 518 bans dual pricing altogether by making it a crime to "impose a surcharge" (see Expressions Hair Design v Schneiderman, 581 US —, —, 137 S Ct 1144, 1153 [2017, Sotomayor, J., concurring] ["On first read, its prohibition on 'impos[ing] a surcharge' on credit card customers appears to prohibit charging customers who pay with a credit card more than those who pay by other means. That is, § 518 may require a merchant to charge all customers the same price, no matter the form of payment" (citation omitted)]). Our time-honored canons of construction, which we have followed in innumerable decisions, say that when statutory language is clear, we do not look to legislative intent at all (Kimmel v State of New York, 29 NY3d 386, 392 [2017], citing Matter of Malta Town Ctr. I, Ltd. v Town of Malta Bd. of Assessment Review, 3 NY3d 563, 568 [2004]; Matter of Raritan Dev. Corp. v Silva, 91 NY2d 98, 106-107 [1997]; New Amsterdam Cas. Co. v Stecker, 3 NY2d 1, 6 [1957]; Matter of De Peyster, [*7]210 NY 216, 225 [1914]). The legislature wrote: "No seller in any sales transaction may impose a surcharge on a holder who elects to use a credit card in lieu of payment by cash, check, or similar means" (General Business Law § 518). No ambiguity is present on the face of the statute; it prohibits the imposition of a surcharge—it says nothing about posting prices or words that may or may not be used.{**32 NY3d at 398}
All agree, though, that the legislature did not mean to prohibit different cash and credit pricing. What the New York Legislature did mean by adopting section 518 has confounded everyone who has considered it, including a long list of great legal minds. I am not one of those, but I can see enough pervasive uncertainty in the attempts to interpret this criminal statute to lead me to conclude a legislative do-over is necessary.
As the majority notes, the New York Legislature enacted section 518 in 1984, just as the credit card surcharge ban in the Federal Truth in Lending Act (TILA) expired. However, the legislature omitted the portions of TILA defining "surcharge," "discount," and "regular price" (majority op at 
390). No one was ever prosecuted under TILA (tr of oral argument at 25, lines 5-7; Expressions Hair Design v Schneiderman, 581 US &mdash, 137 S Ct 1144 [2017]), so there are no enforcement actions or judicial interpretations on which the New York Legislature could have relied in evaluating what TILA meant, either with or without its definitions.
Even were one to construct some rationale to cast aside our plain-language doctrine, any interpretation would need to clear two further hurdles. The first hurdle is not to determine what Congress thought TILA did. The first hurdle, instead, is what the New York Legislature, in 1984, thought TILA did—without the aid of the United States Supreme Court's interpretation 33 years later. The second hurdle is what the New York Legislature meant by choosing to discard the federal definitions.
III.
Lacking any enforcement history for TILA, there is some legislative history, which the majority partially catalogues. Two things are clear from that history. First, TILA permitted differential pricing. Merchants were free under TILA to provide a lower price for cash purchases than for credit. Second, Congress did not want potential customers to be lured into stores or to checkouts by a posted low price, only to find that that price was not available if they paid by credit card.[FN1] The TILA definitions and legislative history, however, do not answer{**32 NY3d at 399} the question of [*8]whether a merchant who prominently posts: "All sandwiches $10, 50-cent surcharge if you pay by credit" would violate TILA. The luring/deception/disclosure purposes underlying TILA are satisfied by that posting as much as they would be by a sign that instead said: "All sandwiches $10.50, 50-cent discount if you pay by cash." The TILA definitions of "surcharge," "discount" and "regular price" do not say whether the "regular price" may be posted as an X+Y amount, nor does the legislative history help resolve the lawfulness of such postings.
As I mentioned, though, what Congress meant is not the issue here. Instead, we need to determine what the New York Legislature thought TILA meant. The New York legislative history—again recited by the majority—expresses the same luring/deception/disclosure concern, but likewise says nothing about whether a merchant may post the credit price as "All sandwiches $10 plus 50 cents for credit card payments." General Business Law § 518's legislative history demonstrates the same concern: avoiding the luring or duping of customers by posting low prices that turned out to be available for cash purchases only. The Sponsors' Memorandum stated that the bill was aimed against "dubious marketing practices and variable purchase prices" (Sponsors' Mem, Bill Jacket, L 1984, ch 160 at 6, 1984 NY Legis Ann at 93). The State Consumer Protection Board likewise explained that "surcharges" were prohibited by the legislation because they constituted "unannounced price increases at the point of sale" (Mem of Associate Counsel, NY St Consumer Protection Board, Bill Jacket, L 1984, ch 160 at 10).
The majority agrees that posting the statement expressing the discount as a reduction from the credit price would not land a merchant in jail. However, for purposes of luring, deception{**32 NY3d at 400} and disclosure, the latter is no better than the former. So, even if we assume the New York Legislature wanted to copy TILA exactly (a proposition which Judge Garcia's dissent casts in serious doubt), there is no basis to believe that it understood TILA to criminalize "All sandwiches $10, plus 50 cents if you pay by credit card."
Next, we run into a problem vigorously pressed by Judge Garcia in his dissent: the New York Legislature surely knew of the statutory definitions of "surcharge," "discount" and "regular price" in TILA, and deliberately chose to remove them. We import meaning to that omission, so the presumption is that the legislature intended something different. But what? Judge Garcia persuasively argues, based on a wealth of our decisional law, that "[b]y omitting the federal statute's intricate definitions, the legislature 'signaled a purposeful legislative modification' of the federal surcharge ban" (Garcia, J., dissenting op at 
416, citing Commonwealth of the N. Mariana Is. v Canadian Imperial Bank of Commerce, 21 NY3d 55, 61 [2013]). As he reads it, General Business Law § 518 is not a disclosure statute at all. The omission of the definitions was to make clear that General Business Law § 518 prevented describing any price difference as a[*9]"surcharge" (or any form of price increase) attributable to credit card use.[FN2] Judge Rivera, concurring, reads section 518 to the same effect.{**32 NY3d at 401}
IV.
It might be sufficient to stop there, because we cannot determine what the New York Legislature thought TILA prohibited, and cannot tell what it meant by copying only a part of TILA and omitting the definitions. Unlike TILA, General Business Law § 518 has an enforcement history, of sorts, as well as judicial interpretations, of sorts. Those put a nail in General Business Law § 518's coffin.
Judge Garcia sets out in detail the way in which the Bronx District Attorney (DA) interpreted General Business Law § 518 as criminalizing an oral description of a "higher" price for credit card prices—even when both the credit and cash prices [*10]were prominently posted at the station, and the trial court's contrary interpretation of the statute (Garcia, J., dissenting op at 
420-421). Judge Garcia likewise chronicles the Attorney General's 2008 and 2009 enforcement actions against home heating oil sellers who, when asked over the phone about credit card purchases, answered that they charged an additional fee for such purchases (Garcia, J., dissenting op at 
421). The Attorney General entered into consent judgments against those sellers, declaring "[a]n investigation by the Office of the Attorney General reveal[ed] that consumers were regularly and routinely charged . . . illegal surcharges." As part of the district court trial, the plaintiffs offered an affidavit from one merchant declaring that as part of these sweeps she had agreed to "a $1,100 fine and restitution to customers who had paid the surcharge." It is worth noting that, at the argument of this appeal, the Attorney General interpreted General Business Law § 518 as not applying to oral statements at all, contending "the best way to read the statute is that when there is a price posted for sellers and transactions, whether it's on a tag or a menu or a sign, that's when the statute comes into play" (oral argument tr at 20, lines 8-12).
That brings us to the present litigation. In the federal district court, the Attorney General argued a yet different interpretation of General Business Law § 518, explaining{**32 NY3d at 402}
"[a] seller violates § 518 only if it fails to display its credit card price with equal prominence as its cash price. So understood, the statute prohibits only misleading and deceptive commercial speech, is reasonably related to the State's interest in preventing consumer deception, and thus (to the extent the plaintiffs' proposed conduct would violate the statute) would not violate the plaintiffs' First Amendment rights" (mem of law in support of mot to dismiss at 38 in Expressions Hair Design v Schneiderman, 975 F Supp 2d 430 [SD NY, July 12, 2013], available at 2013 WL 12131445).
Under that view, only "misleading . . . commercial speech" could be prosecuted. Query what that means for a merchant posting: "All sandwiches $10, plus 50 cent surcharge if you pay by credit card"—there is nothing misleading about that sign. The Attorney General specifically pooh-poohed the merchants' fear of prosecution for the words they might use to explain the price differential. To further add to the confusion about what sign might land a merchant in jail, the Attorney General's reply memorandum asserted that "Section 518 requires sellers to display the total credit card price, not just the additional credit card fee" (reply mem of law in further support of mot to dismiss at 9 in Expressions Hair Design v Schneiderman, 975 F Supp 2d 430 [SD NY, July 12, 2013], available at 2013 WL 12131447).
Judge Rakoff interpreted the statute largely as Judges Garcia and Rivera do, holding that General Business Law § 518 "draws the line between prohibited 'surcharges' and permissible 'discounts' based on words and labels, rather than economic realities" (Expressions Hair Design v Schneiderman, 975 F Supp 2d 430, 444 [SD NY 2013]).
In the Second Circuit, the Attorney General advanced a yet different interpretation of General Business Law § 518. Gone was the talk of prices being displayed as prominently as others. Instead, the Attorney General argued the law prohibited the imposition of a surcharge, which is conduct, not speech, and which can be readily distinguished from offering a discount, which is lawful:
"The district court erroneously believed that the only distinction between surcharges and discounts is how they are described. But laws regularly distinguish between surcharges and discounts by making an objective determination of a regular or{**32 NY3d at 403} prevailing price—for example, price-gouging statutes prohibit merchants from imposing excessive prices above such a baseline. Thus, whether a merchant is imposing a surcharge or providing a discount depends not solely on the merchant's speech, but rather on such nonspeech factors as the merchant's posted prices, past prices, industry standards, and accounting or tax practices" (corrected brief for appellant Schneiderman at 25 in Expressions Hair Design v Schneiderman, 808 F3d 118 [2d Cir 2015], available at 2014 WL 1259306).
The Second Circuit adopted something like the Attorney General's new reformulation of General Business Law § 518: posting a cash price along with an additional fee for credit card use, even if prominently posted, lands a merchant in jail. If, instead, a merchant posted a credit card price and a lower cash price with equal prominence, but described the difference as due to a credit card surcharge, the Second Circuit abstained from answering whether the merchant could be jailed (Expressions Hair Design v Schneiderman, 808 F3d 118, 136-140 [2d Cir 2015]).
In the United States Supreme Court, the Attorney General argued that General Business Law § 518 required merchants to display full dollars-and-cents price for credit card purchases. Perhaps puzzled by the notion that the New York Legislature truly intended to send merchants to jail for posting, "All sandwiches $10, plus 50-cent surcharge for credit card payments," the Court sent the case back to the Second Circuit with indirect (from the majority) and direct (from the concurrences) suggestions to certify the question to our Court (see e.g. Supreme Court oral argument tr at [*11]37, lines 4-5, in Expressions Hair Design v Schneiderman, 581 US &mdash, 137 S Ct 1144 [Jan. 10, 2017] [Chief Justice Roberts observing that a law protecting New Yorkers from having to compare the price of "$10" and "$10 plus 20 cent surcharge with credit" requires a "very patronizing and condescending view of the capabilities of the American consumer"]). As I mentioned at the start, the Supreme Court majority expressed some suspicion of the Second Circuit's construction of General Business Law § 518, saying it was not "clearly wrong," but implying the Second {**32 NY3d at 404}Circuit should use the certification procedure. Justices Breyer, Sotomayor and Alito expressly urged certification to us.[FN3] V.
Criminal statutes must be sufficiently precise so that the public knows what conduct will render them liable, and so law enforcement officers will know what conduct constitutes a violation thereof (People v Stuart, 100 NY2d 412, 420 [2003] ["In addressing vagueness challenges, courts have developed a two-part test. The first essentially restates the classical notice doctrine: To ensure that no person is punished for conduct not reasonably understood to be prohibited, the court must determine whether the statute in question is sufficiently definite to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute . . . Second, the court must determine whether the enactment provides officials with clear standards for enforcement" (citations and internal quotation marks omitted)]).
The wildly haphazard, varying interpretations of General Business Law § 518 demonstrate that no one has much of an idea what the legislature intended, except that—contrary to the plain statutory language—the legislature wanted to allow merchants to offer lower prices for cash payments than for credit. From the Bronx DA to the Attorney General to the federal district judge, Second Circuit, United States Supreme Court and now our Court, we have no common understanding of what General Business Law § 518 criminalizes. We do not know, and the majority does not answer, whether it applies just to written postings or price tags, or also to prices that are disclosed only by oral statements—such as those prosecuted by the Attorney General in 2008 and 2009. How, then, can we expect a New York merchant to understand what sign to post, or what to say or not say, under penalty of jail? It is not sufficient, as the majority does, to settle on one possible interpretation, when there is no reason to believe that interpretation is better than any other when it comes to the legislative intent, and when that interpretation is surely not what the statute's words say.{**32 NY3d at 405}
There are, by my count, at least five defensible interpretations available for General Business Law § 518. First is the interpretation the Bronx DA and the Attorney General advanced well before this lawsuit: regardless of what is posted, any description of a higher price for credit, whether oral or written, violates the law.
Second is the majority's interpretation: "General Business Law § 518, like its federal precursor, permits differential pricing but requires that a higher price charged to credit card users be posted in total dollars-and-cents form" (majority op at 
392). According to the majority, its formulation permits the merchants to describe the price difference in whatever way they wish, even calling it a surcharge attributable to the credit card companies.
Third, if one focuses on the expressed legislative purpose of preventing luring and deception, and promoting full disclosure, General Business Law § 518 could prohibit the posting of a cash price only, without simultaneously disclosing (with equal prominence) that use of a credit card will cost a specified amount more.
Fourth, General Business Law § 518 may simply mean what it says: merchants may not impose a higher price for use of a credit card (or, in the vernacular, "Same price—cash or credit").
[*12]
Fifth, Judges Rivera, Garcia and Rakoff may be correct: General Business Law § 518 prevents the description of the price difference as a "surcharge" or any other words conveying the idea that credit cards cost more, while allowing merchants to say that cash costs less.
I find it unfathomable that the legislature intended to send merchants to jail when they prominently post the cash price along with the incremental price, if any, for payment by credit card. Were consumers misled by that sort of fully informative posting, what can be said for the several examples Judge Garcia provides of the State itself tacking on fees (expressed in incremental percentage terms) for use of a credit card when paying the State? I note that, when I looked into paying my New York State income tax online, the New York State Department of Taxation and Finance permits me to pay by credit card, so long as I pay a "convenience fee of 2.25%" (New York State Department of Taxation and Finance, Credit and debit card payment information, available at https://www.tax.ny.gov/pay/all/wells_fargo_card_payment_information.htm).
{**32 NY3d at 406}Nothing in the statutory language or legislative history supports the conclusion that the majority's interpretation is closer to the legislature's intent than several other, very different, interpretations. The result cuts against the intuitive understanding that any New Yorker reading the statute—or selling or buying sandwiches—would have.
Accordingly, while I concur in answering the narrow certified question in the affirmative, I disagree with the balance of the majority's analysis, and conclude that General Business Law § 518 is void for vagueness.

Garcia, J. (dissenting). General Business Law § 518 is not a disclosure statute. A merchant therefore does not comply with General Business Law § 518 "so long as the merchant posts the total-dollars-and-cents price charged to credit card users" (majority op at 
384 [quoting the certified question]). Instead, compliance turns on the label a merchant uses to describe the price differential: the merchant may lawfully call that difference a "discount," but may not call it a "surcharge."
Invoking the expired federal surcharge ban, the majority reads General Business Law § 518—a blanket ban on "impos[ing] a surcharge"—to mean that a merchant may impose a surcharge where the total credit-card price is displayed (see majority op at 
393). That interpretation is contradicted by the statute's text, construing General Business Law § 518 to tolerate conduct that it explicitly prohibits. It also distorts the statute's enactment history, importing foreign provisions that the New York Legislature knowingly omitted. And the majority's reading ignores decades of enforcement history, rebuffing the textual interpretation that our state courts and prosecutors have repeatedly ratified.
[*13]
The New York Legislature could have, quite easily, enacted a total dollars-and-cents disclosure requirement. It did not. I therefore dissent and would answer the certified question in the negative.
I.
General Business Law § 518 is the negotiated product of decades of contentious lobbying and legislating. Early on, credit-card companies included standard provisions in their contracts that prohibited merchants from offering cash discounts or otherwise charging credit-card users a higher price{**32 NY3d at 407} than cash customers. These provisions effectively required merchants to raise prices across the board—rather than just up-charging credit-card users—in order to recoup their "swipe fees," thereby concealing the cost of credit. The United States Congress curtailed this practice in 1974 by amending the Truth in Lending Act to provide that a "card issuer may not, by contract or otherwise, prohibit any . . . seller from offering a discount to a cardholder to induce the cardholder to pay by cash, check, or similar means rather than use a credit card" (Pub L 93-495, tit III, § 306, 88 US Stat 1500, 1515 [93d Cong, 2d Sess, Oct. 28, 1974], amending Truth in Lending Act [15 USC §§ 1601-1665]).
Shifting strategies, the credit-card industry began targeting form rather than substance (see Edmund W. Kitch, The Framing Hypothesis: Is it Supported by Credit Card Issuer Opposition to a Surcharge on a Cash Price?, 6 JL Econ & Org 217, 218 [1990]; Richard Thaler, Toward a Positive Theory of Consumer Choice, 1 J Econ Behav & Org 39, 45 [1980]; Amos Tversky & Daniel Kahneman, Rational Choice and the Framing of Decisions, 59 J Bus S251, S261 [1986]). Though "surcharge" and "discount" are nothing more than different labels for the same concept, a number of studies have indicated that consumers react to them very differently: they perceive credit-card surcharges negatively—much like a penalty or loss—but view cash discounts positively—as a reward or bonus (see Daniel Kahneman, Jack L. Knetsch & Richard H. Thaler, Anomalies: The Endowment Effect, Loss Aversion, and Status Quo Bias, 5 J Econ Persp 193, 199, 204 [1991]; Cass R. Sunstein, What's Available? Social Influences and Behavioral Economics, 97 Nw UL Rev 1295, 1312 [2003]). For this reason, credit-card surcharges are more effective than cash discounts at discouraging credit-card use among consumers, which, naturally, has led credit-card companies to oppose "surcharge"-type messaging (see Richard Thaler, Toward a Positive Theory of Consumer Choice, 1 J Econ Behav & Org 39, 45 [1980]; Adam J. Levitin, The Antitrust Super Bowl: America's Payment Systems, No-Surcharge Rules, and the Hidden Costs of Credit, 3 Berkeley Bus LJ 265, 280-281, 312-313 [2005]; see also Cash Discount Act, Hearing before the House of Representatives Subcommittee on Consumer Affairs and Coinage of the Committee on Banking, Finance and Urban Affairs on HR 31 at 24-31, 97th Cong, 1st Sess [1981] [testimony from American Express] ["It is for these reasons that we oppose credit card{**32 NY3d at 408} surcharges, and wholeheartedly support the surcharge ban"]; Cash Discount Act, Hearing before the Senate Subcommittee on Consumer Affairs of the Committee on Banking, Housing and Urban Affairs on S 414 at 55, 97th Cong, 1st Sess [1981] [testimony from MasterCard] ["MasterCard International strongly supports this aspect of the legislation" that "would extend the Truth-in-Lending Act prohibition on credit card surcharges"]).
With the support of the credit-card industry, Congress enacted a federal surcharge ban in 1976, and twice extended it—in 1978, and again in 1981. That ban provided that "[n]o seller in any sales transaction may impose a surcharge on a cardholder who elects to use a credit card in lieu of payment by cash, check, or similar means" (see Pub L 94-222, § 3 [c], 90 US Stat 197 [94th Cong, 2d Sess, Feb. 27, 1976], amending Truth in Lending Act § 167 [a] [15 USC § 1666f]). Congress clarified, however, that the surcharge ban did not prohibit cash discounts: it defined a "surcharge" as an "increas[e]" above the "regular price," and a "discount" as a "reduction" from the "regular price" (id. § 3 [a], amending Truth in Lending Act § 103 [15 USC § 1602]). It further specified that "[t]he term 'discount' . . . shall not mean a surcharge" (id.). Additionally, in connection with the 1981 renewal of the ban, Congress added a provision defining "regular price" to mean
"the tag or posted price charged for the property or service if a single price is tagged or posted, or the price charged for the property or service when payment is made by use of . . . a credit card if either (1) no price is tagged or posted, or (2) two prices are tagged or posted, one of which is charged when payment is made by use of . . . a credit card and the other when payment is made by use of cash, check, or similar means" (see Pub L 97-25, § 102 [a], 95 US Stat 144 [97th Cong, 1st Sess, July 27, 1981] [termed the Cash Discount Act], amending Truth in Lending Act § 103 [15 USC § 1602]).
These provisions had the effect of "permit[ting] merchants to have two-tier pricing systems and to offer a differential between the credit price and the cash price" so long as merchants ensure that, "when prices are tagged or posted, the consumers will be exposed to the highest price" (S Rep 97-23, 97th Cong, 1st Sess at 4, reprinted in 1981 US Code Cong & Admin News 74, 77). [*14]And, under the 1981 amendment, because a "surcharge" {**32 NY3d at 409}frequired an increase above the "regular price" (as newly-defined), there could be no "surcharge" where the "regular price" was the same as the credit-card price.
In debating the enactment and extension of the federal ban, Congress received input from a number of interested parties, including consumer groups, government agencies, business owners, and credit-card companies. Credit-card lobbyists supported the ban, consistently taking issue with pricing practices that conveyed to consumers that they would be penalized for using a credit card (see Cash Discount Act, Hearing before the Senate Subcommittee on Consumer Affairs of the Committee on Banking, Housing and Urban Affairs on S 414 at 32, 35, 97th Cong, 1st Sess [1981] ["(W)e . . . feel that the prohibition against credit surcharges should be made permanent"]; id. at 37 ["The surcharge, imposed by a merchant, makes a negative statement about the card to a consumer"]; Cash Discount Act, Hearing before the House of Representatives Subcommittee on Consumer Affairs and Coinage of the Committee on Banking, Finance and Urban Affairs on HR 31 at 29, 97th Cong, 1st Sess [1981] ["We believe that the surcharge ban has worked well for the past five years" and "should be extended"]; see also S Rep 97-23, 97th Cong, 1st Sess at 8, reprinted in 1981 US Code Cong & Admin News 74, 80 ["Make no mistake about it, the heart and soul of this legislation is the demand of the credit card industry that the Congress extend the ban on credit card surcharges"]). Consumer advocates, by contrast, largely criticized the ban, arguing that surcharge bans actually undermine consumer interests by concealing the true cost of credit (see Cash Discount Act, Hearing before the Senate Subcommittee on Consumer Affairs of the Committee on Banking, Housing and Urban Affairs on S 414 at 7, 97th Cong, 1st Sess [1981] [noting that the "ban on surcharges encourages Americans to use credit cards without knowing the true cost of the credit card"]; see also S Rep 97-23, 97th Cong, 1st Sess at 8-15, reprinted in 1981 US Code Cong & Admin News 74, 80-87). Many merchants also opposed the ban, noting that surcharge prohibitions inhibit business owners from openly passing "swipe fees" onto their credit-card customers (see Cash Discount Act, Hearing before the Senate Subcommittee on Consumer Affairs of the Committee on Banking, Housing and Urban Affairs on S 414 at 28, 97th Cong, 1st Sess [1981] [testimony of family-owned home furnishings retail store officer advocating that Congress "ought to deregulate both" {**32 NY3d at 410}discounts and surcharges, as "those who use (credit) ought to pay for it"]). Facing mounting opposition, the federal surcharge ban eventually failed.
At that point, credit-card companies began lobbying for state-level surcharge bans. Ultimately, a number of states enacted their own variations of anti-surcharge legislation. Minnesota, for instance, imposed a pure disclosure requirement. Under the relevant Minnesota statute, a seller may not "impose a surcharge" on credit-card customers unless the seller "informs the purchaser of the surcharge both orally at the time of sale and by a sign conspicuously posted on the seller's premises" (Minn Stat Ann § 325G.051 [1] [a]). Massachusetts, by contrast, adopted the federal ban wholesale. The Massachusetts Legislature largely copied the operative text of the expired federal ban (Mass Gen Laws ch 140D, § 28A [a]), as well as the statutory definitions for "discount," "surcharge," and "regular price" (id. § 1).
The New York Legislature took yet another approach, adopting portions of the federal ban but omitting certain others. The shell of the ban remained the same: "No seller in any sales transaction may impose a surcharge on a holder who elects to use a credit card in lieu of payment by cash, check, or similar means" (General Business Law § 518). And like the federal surcharge ban, General Business Law § 518 allowed merchants to offer cash discounts: the statute "does nothing to prevent a seller from offering a discount to consumers who pay by cash" (Letter from Assembly Sponsor, May 30, 1984 Bill Jacket, L 1984, ch 160 at 8; Sponsors' Mem, Bill Jacket, L 1984, ch 160 at 5, 1984 NY Legis Ann at 93; see also Mem of Associate Counsel, NY St Consumer Protection Board, Bill Jacket, L 1984, ch 160 at 10). The New York Legislature did not, however, adopt the definition provisions for "discount" or "surcharge" found in the expired federal ban. Nor did it adopt the definition of "regular price"—a term referenced within the "discount" and "surcharge" provisions.
II.
Importing the omitted federal provisions into the New York statute, the majority reads General Business Law § 518 to require that merchants display the "total dollars-and-cents price charged to credit card users" (majority op at 
393). That reading is contradicted by the statutory text, which simply prohibits a merchant from imposing a "surcharge"—even a surcharge {**32 NY3d at 411}conveyed in total dollars-and-cents form. It is also unsupported by General Business Law § 518's legislative history, which indicates that the New York Legislature deliberately deviated from the federal surcharge ban. And it is undermined by the State's own enforcement practices, which include various prosecutions targeting the precise types of total dollars-and-cents surcharges the majority now condones.
Plain Language
[*15]General Business Law § 518, by its terms, prohibits merchants from "impos[ing] a surcharge" on customers who choose to pay by credit card. In interpreting that text, the Court and the parties all agree on two fundamental propositions. First, a credit-card surcharge and a cash discount are mathematically equivalent means of accomplishing the same practical result: a price difference between cash and credit. Second, General Business Law § 518 does not prohibit differential pricing altogether; rather, section 518 prohibits merchants from imposing a surcharge on credit-card customers, but it does not prohibit merchants from offering an equivalent cash discount.[FN1] The plain text of General Business Law § 518, then, is susceptible to only one construction: it prohibits a price difference between cash and credit only when that difference is labelled a "surcharge."
The majority's interpretation of General Business Law § 518—as a price disclosure requirement—is facially inconsistent {**32 NY3d at 412}with the plain language of the statute. Under that reading, a merchant could lawfully inform customers that it "impose[s] a surcharge on a holder who elects to use a credit card in lieu of payment by cash, check, or similar means"—complete with citation to General Business Law § 518—so long as the merchant simply displays the total credit-card price (see majority op at 
393). The merchant could, for instance, post a sign proclaiming that he "IMPOSES A SURCHARGE," or tell credit-card customers at the register that their price "contains a surcharge"—all contrary to the statutory text—so long as the credit-card price is somewhere posted. In other words, the majority's reading enables a merchant to comply with the statute while explicitly purporting to violate it.
More likely, the legislature meant what it said in General Business Law § 518: merchants must communicate their price differential as a discount, not as a surcharge (see Expressions Hair Design v Schneiderman, 975 F Supp 2d 430, 444[*16][SD NY 2013] [noting that "section 518 draws the line between prohibited 'surcharges' and permissible 'discounts' based on words and labels, rather than economic realities"]; People v Fulvio, 136 Misc 2d 334, 338 [Crim Ct, Bronx County 1987] [noting that, under General Business Law § 518, "precisely the same conduct by an individual may be treated either as a criminal offense or as lawfully permissible behavior depending only upon the label the individual affixes to his economic behavior"]; see also Dana's R.R. Supply v Attorney General, Fla., 807 F3d 1235, 1244-1245 [11th Cir 2015] [holding that Florida's similarly-worded surcharge ban "targets expression alone," as liability "turns solely on" a merchant's "choice of words"]). The statutory text is the "clearest indicator of legislative intent" (Majewski v Broadalbin-Perth Cent. School Dist., 91 NY2d 577, 583 [1998]; Matter of DaimlerChrysler Corp. v Spitzer, 7 NY3d 653, 660 [2006] ["(C)ourts should construe unambiguous language to give effect to its plain meaning"]), and the text of General Business Law § 518 contains an unqualified ban on surcharges. By manufacturing a "total dollars-and-cents" exemption, the majority reads General Business Law § 518 to authorize what the statute plainly prohibits.
Enactment History
The catalyst for General Business Law § 518's enactment is clear: it was prompted by the lapse of the federal surcharge ban (see Sponsors' Mem, Bill Jacket, L 1984, ch 160 at 5, 1984{**32 NY3d at 413} NY Legis Ann at 93 [noting that General Business Law § 518 was enacted to fill the gap left by "(t)he expiration of a Federal ban on surcharges on credit card purchases"]). But that time line tells us very little about how the New York Legislature intended to fill that statutory gap. New York's "quick[ ]" enactment (majority op at 
390) of its own surcharge legislation following the lapse of the federal ban does not signify whether the legislature wanted to duplicate the federal ban (like Massachusetts, for instance), or whether, instead, it preferred to enact its own variation (like Minnesota, among others).
The majority determines that New York's surcharge ban was designed to be "coextensive" with its federal counterpart—that the two statutes, though markedly different, must mean the same thing (majority op at 
391). Specifically, the majority relies on the premise that General Business Law § 518 and the federal ban were conceived solely as consumer protection measures designed to ensure disclosure of a merchant's total dollars-and-cents credit-card price; both statutes, the majority reasons, sought to combat "deceptive marketing" practices and "the duping of customers" by promoting disclosure of a merchant's total credit-card price (majority op at 
390-392). Because the federal and state legislators had these same purposes in mind, the reasoning goes, they must have intended to write identical statutes (see majority op at 
391-392). As a result, the majority reads the omitted federal provisions into the New York statute, apparently attributing their absence to some sort of legislative blunder.
Each of these foundational assumptions is flawed. Initially, the majority's depiction of General Business Law § 518 as a pure disclosure statute is unsupported by the statute's enactment history, which suggests ample reason for the legislature's departure from the federal ban. Nor do the majority's selected excerpts of legislative history justify its disregard of the statutory text. And in any event, even if the legislature and Congress considered "identical concerns" (majority op at 
391), that fact would not indicate whether or not the New York Legislature ultimately opted to replicate the federal ban. There is no indication that New York's surcharge ban was intended to be coextensive with the federal ban, and the legislature's deliberate deviations from the federal statute signify the opposite.
i.
Like the federal statute, General Business Law § 518's instructive (albeit limited) legislative history is checkered with{**32 NY3d at 414} competing interests. Given consumers' negative reactions to credit-card surcharges, credit-card companies have dependably disfavored "surcharge" labeling (see supra at 
407-408). Unsurprisingly, then, the credit-card industry apparently favored New York's surcharge ban, which served to correct the "unfair disadvantage" faced by "credit card users" due to "[t]he expiration of [the] Federal ban" (Sponsors' Mem, Bill Jacket, L 1984, ch 160 at 5, 1984 NY Legis Ann at 93; see also Expressions, 975 F Supp 2d at 439 ["(T)he credit card industry began lobbying for state-level no-surcharge laws, which were eventually enacted in ten states, including New York"]). The legislature also considered the ban's implications on consumers, including the prominent criticism that it would require "cash customers and those who cannot qualify for credit cards" to "subsidiz[e] credit customers" (Mem of Retail Council of NY St, Bill Jacket, L 1984, ch 160 at 16). And a number of the ban's supporters praised its impact on certain marketing practices, including its prohibition of "unannounced price increases at the point of sale" (Mem of Associate Counsel, NY St Consumer Protection Board, Bill Jacket, L 1984, ch 160 at 10).
[*17]
From this mix of competing motives, perhaps no clear winner emerges. But the legislature balanced those assorted interests and, in the end, it enacted General Business Law § 518. Our role is limited to interpreting that final text; we are not entitled to presume whose lobbying efforts carried the day, or to rewrite the statute to effectuate a preferred policy goal (see Ali v Federal Bureau of Prisons, 552 US 214, 228 [2008] ["We are not at liberty to rewrite the statute to reflect a meaning we deem more desirable"]; Matter of Wolpoff v Cuomo, 80 NY2d 70, 79 [1992] ["It is not the role of this, or indeed any, court to second-guess the determinations of the Legislature, the elective representatives of the people, in this regard. We are hesitant to substitute our own determination for that of the Legislature even if we would have struck a slightly different balance on our own"]). Our restraint is especially warranted where, as here, the statute's history supplies ample explanation for the legislature's chosen text (see 82 CJS, Statutes § 408 ["A court generally cannot supply omissions in a statute merely because it appears that good reasons exist for adding them, especially where it appears that the matter may have been intentionally omitted"]; McKinney's Cons Laws of NY, Book 1, Statutes § 74 ["A court cannot by implication supply in a statute a provision which it is reasonable to suppose the Legislature intended intentionally to omit"]).
{**32 NY3d at 415}Casting aside the statutory text, the majority relies exclusively on fragments of legislative history in concluding that "the legislature made plain" its intention to "create a ban coextensive with its recently defunct counterpart" (majority op at 
391). But even the selective excerpts cited by the majority are far from "clear" that "the intent of New York's legislature, in enacting General Business Law § 518, was to replicate the prohibitions in the federal statute" (majority op at 
391). For instance, the majority cites the Sponsors' Memorandum in support of General Business Law § 518 (see majority op at 
391), which advises that section 518 is "in keeping with" the expired federal ban in the sense that both statutes permitted merchants "to offer a discount for cash if they so desire"—i.e., both statutes permitted differential pricing (Sponsors' Mem, Bill Jacket, L 1984, ch 160 at 5, 6, 1984 NY Legis Ann at 93). Nowhere does that memorandum provide, however, that the two statutes are otherwise "coextensive" (majority op at 
391). Similarly, the majority cites the Assembly Sponsor's letter to the Governor's Counsel, which indicates that the term "surcharge" as used in General Business Law § 518 is "identical" to the federal definition (majority op at 
391, citing Letter from Assembly Sponsor, May 30, 1984, Bill Jacket, L 1984, ch 160 at 8). But even assuming the New York Legislature intended to adopt the federal definition of "surcharge," no one seriously contends that the legislature somehow implicitly adopted the convoluted definition of "regular price"—a term found nowhere in General Business Law § 518.[FN2] Particularly in the context of General Business Law § 518's complete enactment history, these legislative extracts do not justify the majority's disregard of the clear statutory text (see Matter of Avella v City of New York, 29 NY3d{**32 NY3d at 416}425, 437 [2017] [noting that the Court "need not consider the legislative history" where "(t)he plain language of the statute" is clear]; see also oral argument tr at 48 in Expressions Hair Design v Schneiderman, 581 US —, 137 S Ct 1144 [2017] [Justice Sotomayor: "You're asking me to take a lot of steps, which is start with the language of the statute, ignore it, and go to a Federal statute and apply its definitions"]).
ii.
In any event, even if Congress and the New York Legislature weighed the same concerns (majority op at 
391-392), they evidently struck different balances and, as a result, they enacted different statutes. In lieu of "track[ing] the federal statute almost verbatim" (majority op at 
392), the New York Legislature excluded more than half of the relevant federal provisions. By omitting the federal statute's intricate definitions, the legislature "signaled a purposeful legislative modification" of the federal surcharge ban (Commonwealth of the N. Mariana Is. v Canadian Imperial Bank of Commerce, 21 NY3d 55, 61 [2013]).
Specifically, the New York Legislature declined to adopt the provisions defining "discount," "surcharge," and "regular price" found in the expired federal ban. Under those provisions, a "surcharge" was limited to an increase over and above the "regular price" (see Pub L 94-222, § 2, 90 US Stat 197) which, in turn, was precisely defined: where a merchant posted a single price, that price was considered the "regular price"; but where a merchant posted separate prices for cash and credit, the "regular price" was considered the price charged to credit-card users (see Pub L 97-25, § 102 [a], 95 US Stat 144). As a result, there could be no "surcharge" within the meaning of the federal ban so long as the credit-card price was posted. A merchant violated the statute only by posting a single price and then charging credit-card users more than that posted price; conversely, a merchant complied with the statute by simply disclosing its credit-card price, irrespective of the label—"surcharge" versus "discount"—that the merchant employed. In other words, under the layered provisions of the federal statute, a merchant could inform customers that it was "imposing a surcharge" so long as that surcharge was disclosed.
Not so under General Business Law § 518. The New York Legislature declined to import the federal statute's detailed (and not-so-intuitive) definition provisions, leaving only a blanket ban intact. General Business Law § 518 simply prohibits {**32 NY3d at 417}sellers from "impos[ing] a surcharge"—nothing more. Consequently, New York's ban contemplates liability for imposing a surcharge even when that surcharge is disclosed. Put differently, in the absence of the federal definitions, "imposing a surcharge and using the word 'surcharge' " to describe a merchant's price differential are not "two different things" (majority op at 
393); they are exactly the same thing, and comprise the precise conduct prohibited by General Business Law § 518.
Rather than honoring the legislature's omission, the majority reverses it: The majority reads the excluded provisions into the New York statute, dismissing the omission as some sort of legislative misstep. But the legislature "knows how to include and exclude specific items in its statutes," and we "are not free to substitute amendment for construction" by "supply[ing] the omissions of the legislature" (82 CJS, Statutes § 408; see also Commonwealth of the N. Mariana Is., 21 NY3d at 62 ["(W)e cannot read into the statute that which was specifically omitted by the legislature"]). Nor can we "assume the existence of legislative error and change the plain language of a statute to make it conform to an alleged intent" (Matter of Branford House v Michetti, 81 NY2d 681, 686 [1993]). The legislature's omissions demonstrate, in no uncertain terms, that it "intend[ed] to deviate" (majority op at 
392) from the federal ban (see McKinney's Cons Laws of NY, Book 1, Statutes § 74 ["(T)he failure of the Legislature to include a matter within the scope of an act may be construed as an indication that its exclusion was intended"]; see also Commonwealth of the N. Mariana Is., 21 NY3d at 61-62 [noting that the "exclusion of (a) word . . . signaled a purposeful legislative modification of the applicable scope" of the statute]; Matter of Anonymous v Molik, 32 NY3d 30, 37 [2018] [rejecting a statutory construction that "fails to attribute any independent significance" to the legislature's chosen text]; oral argument tr at 44-45 in Expressions Hair Design v Schneiderman, 581 US &mdash, 137 S Ct 1144 [Justice Alito: "(I)f . . . I saw that they copied part of a prior statute, but they deliberately omitted other parts of the prior statute, I would be tempted to infer that they had a reason for omitting the definitions. And that was that . . . they wanted something different"]). The majority's contrary assumption—that the legislature's omissions were accidental, rather than deliberate—is exactly backward (see Commonwealth of the N. Mariana Is., 21 NY3d at 61-62; see also McKinney's Cons Laws of NY, Book 1, Statutes § 74; 82 CJS, Statutes § 408). And notably, {**32 NY3d at 418}in the 34 years since General Business Law § 518's enactment, the legislature has never seen fit to fix the majority's perceived error.
iii.
[*18]Had the legislature wanted to implement the majority's hypothesized disclosure regime, New York's surcharge ban would presumably look very different (see oral argument tr at 38 in Expressions Hair Design v Schneiderman, 581 US &mdash, 137 S Ct 1144 [Justice Kagan: "(T)his does not look like a disclosure requirement"]; id. at 63 [noting that "typically a disclosure regime doesn't leave you in the dark about what you have to say"]). For instance, General Business Law § 23, a true disclosure statute, requires automobile auctioneers to "disclose[ ] the identity of the seller who is actually transferring title or proof of ownership" in
"a written disclosure made in not less than ten-point bold face type and appearing on the front of the sales contract, receipt, invoice, or other document used in connection with the sale of the vehicle that shall set forth the seller's true legal name, complete street address and dealer facility identification number and that shall be captioned 'Identity of Vehicle's Seller,' " as well as on a "conspicuous sign" that must be affixed "to the windshield of each vehicle offered for sale, sold or made available for inspection prior to auction that shall disclose the seller's true legal name, complete street address and dealer facility identification number" (General Business Law § 23 [3] [paragraph entitled "Disclosure"]).
In the context of surcharge legislation, Minnesota's disclosure law specifically requires merchants to disclose their surcharges "both orally at the time of sale and by a sign conspicuously posted on the seller's premises" (Minn Stat Ann § 325G.051 [1] [a]). New York's, by contrast, conveys nothing at all about what a merchant must say, or how the merchant must say it. Where should the total dollars-and-cents price be posted? How prominent must the disclosure be? Because General Business Law § 518 bears little resemblance to a disclosure requirement, these questions go unanswered.
Tellingly, the New York Attorney General's Office has historically invoked state prohibitions on deceptive business practices{**32 NY3d at 419} and false advertising—not General Business Law § 518—to combat the use of undisclosed surcharges and similar bait-and-switch tactics (see Cease & Desist Letter from the Office of the Attorney General, June 2, 2011 at 1 [noting that gas station's "roadside listing of a (cash) price without equally prominent disclosure of the higher standard price for credit purchases" violates "the New York Executive Law 63(12) prohibition against deceptive acts and practices, as well as the General Business Law 349 prohibition against deceptive business practices"]). Under the majority's disclosure-centric reading, General Business Law § 518 is effectively redundant of these existing provisions (see People v Giordano, 87 NY2d 441, 448 [1995] [rejecting an interpretation that "would make the statute redundant"]). Further undermining the statute's purported consumer protection goals, various government entities are apparently exempt from General Business Law § 518; they are authorized to impose credit-card "surcharges" and "fees" without any accompanying disclosure requirement (see Public Service Law § 92-c [9] [permitting telecommunications providers to collect a "premises or location surcharge" for certain calls charged to a credit card]; CPL 420.05 [authorizing New York courts to impose a "reasonable administrative fee" on individuals who pay fines or fees by credit card]; CPL 520.10 [1] [i] [noting that "any person posting bail by credit card . . . may be required to pay a reasonable administrative fee"]; Public Authorities Law § 1045-j [4-a] [b] [authorizing the Water Board to impose "a reasonable administrative service fee" for costs incurred in connection with credit-card transactions]). In these various ways, General Business Law § 518 does not look like, or act like, a disclosure statute.
iv.
At bottom, the majority elevates selected scraps of legislative history over clear statutory text (see majority op at 
391-392). The majority rewrites the history of General Business Law § 518's origin, focusing only on a preferred policy rationale while ignoring other, more plausible legislative motives—motives entirely consistent with the statutory text. It then judicially amends General Business Law § 518 to include detailed provisions of the federal ban that the New York Legislature decidedly omitted, based on a perverse and speculative assumption that the legislature must have wanted—but apparently forgot—to include them.{**32 NY3d at 420}
Enforcement History
Finally, the majority's interpretation is belied by General Business Law § 518's enforcement history. The majority effectively accepts the State's most recent proffered reading of the statute, holding that a merchant is not liable under General Business Law § 518 so long as the merchant displays the total credit-card price (majority op at 
393). But for decades, that interpretation [*19]was disclaimed by the New York Attorney General's Office, by various New York district attorneys, and by our State's lower courts. In fact, General Business Law § 518 has repeatedly been invoked to prohibit surcharges of any kind, even those displayed in total dollars-and-cents form.
The first reported prosecution under General Business Law § 518 occurred in 1986, when the Bronx County District Attorney prosecuted a gas-station owner for imposing an unlawful credit-card surcharge (see People v Fulvio, 135 Misc 2d 93 [Crim Ct, Bronx County 1987]). There, the defendant allegedly told customers that the price of gas was "higher"—five cents "extra" per gallon—if customers paid by credit card (People v Fulvio, 136 Misc 2d 334, 336-337 [Crim Ct, Bronx County 1987]). Although the defendant testified that "the signs in his station clearly stated the 'cash price' and the 'credit price' for his gasoline," he was nonetheless prosecuted because his price differential was "characterized as an additional charge for payment by use of a credit card" (id. at 337, 345). The defendant was convicted at trial.
After trial, the Bronx County Criminal Court granted the defendant's motion to dismiss the charge (see People v Fulvio, 136 Misc 2d 334 [Crim Ct, Bronx County 1987]). In doing so, the court discussed General Business Law § 518's apparent scope, concluding that the statute's applicability depended solely on "the label the individual affixes to his economic behavior" (id. at 338):
"[W]hat General Business Law § 518 permits is a price differential, in that so long as that differential is characterized as a discount for payment by cash, it is legally permissible; what General Business Law § 518 prohibits is a price differential, in that so long as that differential is characterized as an additional charge for payment by use of a credit card, it is legally impermissible." (Id. at 345.)
{**32 NY3d at 421}In the court's view, the critical inquiry under section 518 was "not the act," but rather "the word given" to that act: a "surcharge" (id.).
More recently, in a series of sweeps in 2008 and 2009, the New York Attorney General enforced General Business Law § 518 against a number of Suffolk County heating oil sellers. In those cases, the sellers orally quoted the cash price of oil over the phone, stating that the company "charge[s] a fee on top of that price for using a credit card." The Attorney General informed the companies that their practice violated General Business Law § 518 and ultimately entered into settlement agreements requiring the sellers to, among other things, refund previously imposed surcharges. When asked how a merchant could conform their conduct to comply with section 518, the Attorney General's Office clarified that merchants should "characteriz[e] the difference between paying with cash and paying with credit as a cash 'discount,' not a credit 'surcharge.' " A merchant could not call its price difference a "surcharge"—even if the surcharge was "prominently disclosed to customers before making a purchase." Based on the manner in which section 518 was enforced against them, those sellers understood the statute to "turn[ ] on a semantic distinction in how a company characterizes the added cost of using a credit card."
Despite the sweeping manner in which General Business Law § 518 has consistently been applied—and this protracted litigation regarding its ostensible breadth—the legislature has never amended the statute or otherwise indicated that a narrower scope was intended. In fact, although bills to amend the statute have been proposed, those efforts have thus far been unsuccessful (see 2017 NY Assembly Bill A5393). In light of section 518's enforcement in this manner "without any interference from the legislative body, we can infer, to some degree, that the legislature approves of [this] interpretation" (Greater N.Y. Taxi Assn. v New York City Taxi & Limousine Commn., 25 NY3d 600, 612 [2015]).
III.
To be clear, I share the parties' concern that General Business Law § 518, as textually interpreted, triggers serious constitutional questions: the legality of a price differential turns on the language used to describe it. But the canon of constitutional avoidance is not a license to disregard statutory text, and we cannot "contort, disfigure, or vitiate a law's plain meaning and readily discerned purpose merely for the sake of{**32 NY3d at 422} statutory preservation" (Dana's R.R. Supply v Attorney Gen., Fla., 807 F3d 1235, 1242 [11th Cir 2015] [citation omitted]; see also George Moore Ice Cream Co. v Rose, 289 US 373, 379 [1933, Cardozo, J.] ["(A)voidance of a (constitutional) difficulty will not be [*20]pressed to the point of disingenuous evasion"]). We are not entitled to rewrite a constitutionally dubious statute to dodge constitutional scrutiny.
Consistent with the text of the statute, I would answer the certified question in the negative: A merchant might comply with General Business Law § 518 by posting the total dollars-and-cents credit-card price, but also might not. That all depends on the label—"surcharge" or "discount"—affixed to the merchant's price differential. If the merchant offers a discount, he has complied with the statute; if he "impose[s] a surcharge" (General Business Law § 518), he has not.
Chief Judge DiFiore and Judges Stein and Feinman concur; Judge Rivera concurs in result in a concurring opinion; Judge Wilson concurs in part and dissents in part in an opinion; Judge Garcia dissents in an opinion and votes to answer the certified question in the negative.
Following certification of a question by the United States Court of Appeals for the Second Circuit and acceptance of the question by this Court pursuant to section 500.27 of the Rules of Practice of the Court of Appeals (22 NYCRR 500.27), and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, certified question answered in the affirmative.

Footnotes

Footnote 1:In their brief, plaintiffs give the examples: "Sandwich: $10 cash price"/"$0.20 per item added to credit-card purchases" and "Sandwich: $10 cash price"/"2% per item added to credit-card purchases."

Footnote 2:It is not clear from the record and oral argument whether one of the plaintiffs, Expressions Hair Design, still wishes to advertise its pricing scheme in this manner. It no longer does so.

Footnote 3:Additionally, the Second Circuit found no basis to conclude that the statute would violate the First Amendment as applied to a hypothetical two-sticker pricing scheme in which a merchant characterized the price difference as involving a "surcharge" or an "extra" charge for paying with a credit card (see id. at 135-142). The court reasoned that "it is far from clear that Section 518 prohibits [such] conduct in the first place" (id. at 137) because, "[i]n light of the fact that Section 518's enactment was driven by the expiration of the federal surcharge ban, it is entirely possible, if not likely, that New York courts would construe Section 518 as being identical to the lapsed federal ban" (id. at 139).

Footnote 4:Defendants assert this interpretation only as a fallback to which they would retreat if we were to reject their principal contentions.

Footnote 5:It is not clear that the parties dispute this issue. Plaintiffs do not assert that the statute should be interpreted in this manner, and, at oral argument, counsel for the defendants stated that a merchant's statement that the higher price charged to credit card users represents a surcharge would not violate General Business Law § 518.

Footnote *:In the original federal surcharge ban, Congress defined "surcharge" as "any means of increasing the regular price to a cardholder which is not imposed upon customers paying by cash, check, or similar means" and "discount" as "a reduction made from the regular price" (Pub L 94-222, § 3 [a], 90 US Stat 197 [94th Cong, 2d Sess, Feb. 27, 1976]). In 1981, Congress defined "regular price" as
"the tag or posted price charged for the property or service if a single price is tagged or posted, or the price charged for the property or service when payment is made by use of an open-end credit plan or a credit card if either (1) no price is tagged or posted, or (2) two prices are tagged or posted, one of which is charged when payment is made by use of an open-end credit plan or a credit card and the other when payment is made by use of cash, check, or similar means" (Pub L 97-25, § 102 [a], 95 US Stat 144 [97th Cong, 1st Sess, July 27, 1981]).
Footnote 1:When one looks at the federal legislative history, the paradigmatic case repeatedly appearing therein is about a completely undisclosed surcharge, discovered at the cash register (see Sponsors' Mem, Bill Jacket, L 1984, ch 160 at 5, 6, 1984 NY Legis Ann at 93 ["In effect, two price scales would exist for the merchant who would advertise a certain price and, at the time of the sale, raise or lower the price according to the method of payment" (emphasis added)]; S Rep 97-23, 97th Cong, 1st Sess, reprinted in 1981 US Code Cong & Admin News at 74, 77 ["In other words, consumers cannot be lured into an establishment on the basis of the 'low, rock-bottom price' only to find at the cash register that the price will be higher if a credit card is used"]; 127 Cong Rec S4236 [Mar. 12, 1981] ["Mr. D'AMATO . . . I would ask you, what does that person do when he has arrived at the cash register and finds out that there is a 10-, 15-, or 20-percent surcharge for the meal he has just consumed because he will be using a credit card?"]; id. at S4220-S4221 ["Mr. GARN . . . This assures that consumers cannot be lured into an establishment on the basis of the 'low rockbottom' price, only to find at the checkout counter that it will cost more if a credit card is used"]).

Footnote 2:The federal legislative history is replete with confusion about TILA's proper interpretation. In 1977, for example, the Federal Reserve issued regulations forbidding "[a]ny pricing system" advertising "a cash price which is not available to someone purchasing with a credit card" (42 Fed Reg 743, 780-781 [Jan. 4, 1977]). The next year, the Federal Reserve issued regulations saying that actually gas stations could post signs and posters stating "the cash price without also disclosing the credit card price," so long as the credit-card price is listed at the pump (43 Fed Reg 3897, 3899 [Jan. 30, 1978]). Many commenters from that period describe merchants who stop engaging in dual pricing because the regulations were too hard to understand (see Sen. Christopher J. Dodd, Credit Card Surcharges: Let the Gouger Beware, NY Times, Mar. 12, 1984 at A16 ["(M)any merchants are not sure what the difference between a discount and a surcharge is and thus do not offer different cash and credit prices for fear they will violate the ban on surcharges"]; Carol Krucoff, Money: When Cash Pays Off, Wash Post, Sept. 22, 1981 ["(T)he regulations have been so complicated. Smaller business people, who are most likely to offer (discounts), may have been intimidated by the fear it could be viewed as an illegal surcharge"]; Cash Discount Act, Hearing before the Senate Subcommittee on Consumer Affairs of the Committee on Banking, Housing & Urban Affairs on S 414, 97th Cong, 1st Sess at 22 [1981] [amidst a hearing that contains several examples, Nancy Teeters, Member of the Federal Reserve Board of Governors, remarking "I have a problem, as I said, in telling the difference between a discount and a surcharge. If you just change the wording a little bit, one becomes the other"]). If federal legislators and regulators had no clear understanding of TILA's requirements, it is quite a stretch to believe that the New York Legislature had any clear understanding of it, and impossible for us to know what the New York Legislature thought it did by omitting the federal definitions.

Footnote 3:Justices Sotomayor and Alito also noted in their concurrence that they merely "assume[d]" the interpretation of the federal statute as requiring a full dollars-and-cents credit card purchase price was correct (Expressions Hair Design v Schneiderman, 581 US &mdash, — n 1, 137 S Ct 1144, 1154 n 1 [2017]).

Footnote 1:I agree with the majority that the statute does not prohibit differential pricing altogether—i.e., it does not require a single price for all cash and credit-card transactions. On that point, General Business Law § 518's legislative history is explicit: "merchants are permitted to offer cash discounts" (see 
majority op at 388 see also Sponsors' Mem, Bill Jacket, L 1984, ch 160 at 5, 1984 NY Legis Ann at 93 ["A merchant would be able to offer a discount for cash if they so desire"]; Letter from Assembly Sponsor, May 30, 1984, Bill Jacket, L 1984, ch 160 at 8 ["It is important to note that this bill does nothing to prevent a seller from offering a discount to consumers who pay by cash or check."]; Mem of Associate Counsel, NY St Consumer Protection Board, Bill Jacket, L 1984, ch 160 at 10 ["Merchants, however, may continue to offer discounts to those customers purchasing in cash"]). And giving the term "surcharge" its ordinary meaning—"a charge in excess of the usual or normal amount"—the statute, on its face, does not purport to prohibit sellers from offering cash discounts (Webster's Third New International Dictionary 2299 [2002]; Black's Law Dictionary 1579 [9th ed 2009] [defining "surcharge" as "(a)n additional tax, charge, or cost"]; oral argument tr at 10-11 in Expressions Hair Design v Schneiderman, 581 US &mdash, 137 S Ct 1144 [2017] [Justice Breyer: "If you go above the regular price, it's a surcharge. If you go below the regular price, it's a discount"]).

Footnote 2:In full, that definition reads:
 "[T]he term 'regular price' means the tag or posted price charged for the property or service if a single price is tagged or posted, or the price charged for the property or service when payment is made by use of an open-end credit plan or a credit card if either (1) no price is tagged or posted, or (2) two prices are tagged or posted, one of which is charged when payment is made by use of an open-end credit plan or a credit card and the other when payment is made by use of cash, check, or similar means. For purposes of this definition, payment by check, draft, or other negotiable instrument which may result in the debiting of an open-end credit plan or a credit cardholder's open-end account shall not be considered payment made by use of the plan or the account" (see Pub L 97-25, § 102 [a], 95 US Stat 144 [97th Cong, 1st Sess, July 27, 1981]).